The Clerk has advised me that all counsel who need to be present are indeed present, and so we can proceed directly to our first argument in Ayer v. Piaker & Lyons, 1735.13. Mr. Kang. Thank you, Your Honor. May it please the Court. I'm Edward Kang, and I represent the 49 plaintiffs' appellants in this matter. I have one point that I'm going to discuss today, that the District Court aired when it ruled that plaintiffs were on inquiry notice of their claims against the defendants Piaker & Lyons, Simmons, and Paventi as of April 2010, when the SEC brought an enforcement action against McGinn Smith for Ponzi scheme. The District Court reached this conclusion when ruling on a motion to dismiss in 2015 and dismissed two claims based on that ruling. The District Court reached the same conclusion. It reiterated the same conclusion when ruling on a motion for a summary judgment in 2016, which dismissed a claim as to everyone except three plaintiffs who have since dismissed their claims voluntarily. According to the trial court, when the SEC brought its enforcement action in April 2010, that automatically put the plaintiffs on inquiry notice about their potential claims against the auditors and accountants of McGinn Smith, Piaker & Lyons, and its principals, Simmons, and Paventi. Mr. Kang, why do you even put it that way, that they're automatically on notice of claims against these particular parties? Isn't the point rather that they are then on inquiry notice that they've been defrauded? And then it's up to them to take steps to figure out who, if anyone, against whom, if anyone, they have a viable claim. Your Honor, I agree with that statement. When the SEC brought its enforcement action back in April 2010, plaintiffs were put on inquiry notice, and they had their suspect, McGinn Smith. The SEC brought an action against McGinn Smith and a number of affiliate entities. How could you- In reading the SEC complaint, how could you conclude that the auditors weren't aware of it? For example, SEC complaint says that by September 2009, approximately one half of all funds, assets, has been loaned or invested and affiliated, often cash poor and financially desperate, McGinn Smith entities. Only about 3.6 million of the approximately 106 million raised by the four funds were invested in liquid publicly traded companies. Auditors would have discovered that, wouldn't they? No, Your Honor. Auditor's job is not to discover fraud. Auditor's job is to render opinion about conformity of financial statements as represented by the management. Auditor's job is not to check every entry and every transaction that's made by the management and to confirm they're accurate. Auditor specifically represents in their papers, in their opinions to public and to their management team, that their opinion is limited for that purpose, that the financial statements are in conformity with the generally accepted accounting principles. Nothing more than that. So the auditor wouldn't have been reviewing and checking the substance behind the recorded inter-firm transactions, in your view? I believe the auditors have reviewed those things. The question is whether that review alone is sufficient. That's something that's to be decided. In some situations, yes, auditors do detect fraud. Go ahead, please. That goes to the merits of whether there is a claim against these auditors, doesn't it? The point is whether or not the SEC complaint would allow private individuals to figure out that they could, right then and there, bring a claim against the auditors isn't the issue. Once that complaint is filed, isn't it the responsibility of defrauded parties to investigate? Suppose there never had been a statement by the SEC expert much later. The plaintiffs can't just say, well, we never did any investigation to figure out who, if anyone, is responsible for defrauding us. As I understand, correct me if I'm wrong, isn't it the case that the plaintiffs concede that they took no steps to investigate the liability of the auditors or anyone else, essentially? And that is correct, Your Honor. And the reason that they did not take any further steps other than following along what the court was doing and what the permanent receiver who was appointed by the district court was doing at the time, and the record is replete with the statement from the then 68 plaintiffs who said they checked weekly, sometimes daily, about what was going on with the receiver and receiver's efforts to try to recoup the money that was lost. It begs the question about why should you look for another potential defendant when there is already a defendant identified? For the same reason that you're here today, because the defendant who's been identified may have no money and you're looking for a deep pocket to go after who may have some money to contribute to the fund, right? That's why you go looking for the secondary parties, the law firms, the auditors, the accountants. And the question is, if the plaintiff—we'd have a different case, wouldn't we, if the plaintiff said, we hired private investigators, we made inquiries of the auditors, we tried to find out what they knew, and we came up against a blank wall. We were not able to develop any information. We didn't have subpoena power. Wouldn't that be a very different situation than just we sat back and waited and hoped the SEC would come up with enough money to make us whole? Well, Your Honor, this Court addressed that very point in the Lentil case in 2005, when that issue came up about whether the plaintiff did enough diligence about the inquiry. And in that case, there was a New York attorney general's office who started investigating against Merrill Lynch, who was a secondary actor. And by the way, in that case, this Court noted the difficulty of identifying a secondary actor or tertiary actor as opposed to the primary actor. And in that case, in reversing the district court's decision that dismissed the case based on statute of limitation, this Court said, unlike the New York attorney general's office or SEC who has subpoena power, the individual plaintiffs do not have that kind of power absent filing an action. But could I speak to Judge Lynch's point? Is he right in saying, and this is my understanding as well, that there's no reflection in the record of any efforts that plaintiffs made to investigate the nature of the fraud and other possible defendants? That your position seems to be that you weren't in possession of information until Ms. Palin testified in 2014, and that at that point, you had enough to state a claim that would survive, and that's what was necessary under the Pontiac case. But does the record reflect any efforts at all that were made after the plaintiffs learned of their substantial losses because of the McGinn-Smith fraud? No, Your Honor. I believe you're correct. The record does not reflect any actions done by the plaintiffs besides following along what happened with the McGinn-Smiths. Your Honor, I see that my time is up. May I briefly conclude and answer your question? Can I just ask one question, too? Sure. And that is, I know that Simons was identified as a target by the U.S. Attorney's Office in their investigation as to the fraud here. I know that the SEC had a website for this fraud. Is that right, that published some information? That was by the receiver, yes, Your Honor. The receiver published information almost daily about what was going on. So did the receiver publish that Simons had been identified as a target? I know there was a motion to quash a subpoena directed to him, and his lawyer said he's been identified as a target of this investigation. Was that put on the website at the time it happened? I believe it did. I'm not sure, Your Honor, because that was done. It was done in the separate action filed by the Department of Justice, by the United States government, in a criminal action. I don't think that was done by the SEC action, but I'm not quite sure. But more importantly, Your Honor, that was done in 2011, which is a year after the SEC action was brought. But still before the two years started to run, right? That is correct, Your Honor. And that point is well taken. That point has not been addressed by the district court. The court should have addressed what information was available to the plaintiffs. And, Your Honor, you mentioned whether the SEC complaint at the time mentioned certain transactions between the funds or related entities, which is the classic example of Ponce's scheme. And when that happened, should you go after every professional who was involved in underwriting of a security, issuing of a security, such as a lawyer who wrote the PPMs, or such as a bank who lent money to McGinn Smith, such as other professionals who participated in it? Your Honor, the SEC complaint is devoid of any allegations against the accountants and auditors. It does not even mention their name. And it does not even use the terms such as accountants and auditors who were involved. Thank you, Mr. Kang. We have two minutes for rebuttal. We'll hear from Mr. Sheehan. Thank you, Your Honor. Good morning. May it please the Court. My name is Brendan Sheehan on behalf of the defendants' appellees. Your Honor, plaintiff's argument that they were not on inquiry notice of their aiding and abetting fraud claims against the defendants until they had access to the defendants' work papers in 2014 through the testimony of Ms. Palin fails for multiple reasons. First, in reaching its inquiry notice determination below, the lower court cited several cases in which courts held that plaintiffs who are on inquiry notice of an underlying fraud are also on inquiry notice of aiding and abetting fraud claims predicated on that underlying fraud. The plaintiffs do not make any material effort to distinguish or to dispute any of those cases, and I would submit that this Court adopted similar reasoning just this March in the Sage and Precision case, which we've cited in our papers. However, even if there was a need for defendant-specific storm warnings, as plaintiffs argue, it's important to note that there were multiple defendant-specific storm warnings between 2010 and 2012, some of which Your Honors have highlighted, and even if the plaintiffs were found to be on inquiry notice as late as September of 2012, two years prior to commencement of this suit, that would still render time barred under the Pennsylvania and New York Statutes of Limitations all but one of the plaintiff's claims. There's one Florida plaintiff whose claims would be timely under New York law. And so I'd like to highlight some of those storm warnings which Your Honors have touched on. On November 5, 2010, there was a motion to quash filed by my colleague in the SEC action, a motion to quash a subpoena filed to Mr. Simons. The accompanying memorandum of law indicated both that the defendants performed tax work for McGinn Smith and also that as a result of that tax work, Mr. Simons was the target of a criminal investigation. How would the investors learn of that? Well, I believe that they had a duty, and this was filed in the Northern District of New York. They knew that the broker dealer was located in the Northern District of New York, which is based in Albany, and that the SEC action had been commenced in the Northern District of New York. I believe it was incumbent upon them to monitor the public docket. There was- If they had shown that, that they had actively monitored the docket, that they hired an investigator, but that some of these facts were not obvious and difficult to develop without subpoena power, as they suggest, do they have to-one can be diligent without necessarily being able to plead a complaint that would satisfy the particularity requirements of the federal rules. For the statute to run in a kind of fair and equitable way, do you have to demonstrate the particular allegations that would be necessary to survive a rule? A specificity motion to dismiss could have been satisfied? Your Honor, we would submit that the answer to that is no, and that goes to whether or not the Supreme Court standard in the Merck case would be applicable here, and we would argue that, just as in the Coke v. Christie's case and in Siege and Industries, the common law fraud claim should be governed by the common law agreed standards of the respective states. But aren't some of the same considerations that were at play in Pontiac fair to apply here, that one can have suspicions, but we discourage fraud complaints that are based just on suspicions, don't we? I would submit, Your Honor, that by not investigating, plaintiffs essentially waive their right to those considerations, and New York courts have distinguished between circumstances such as this, where plaintiffs don't perform any investigation and have found that that's fatal to their claim, whereas if they had investigated, which they admit they did not, then at least for the New York statute of limitations, the time would be delayed until a reasonable plaintiff would have discovered sufficient. Is the rule very much different in Florida, Delaware, and New Jersey? There is no second part in those states. Those states it begins to run when the plaintiff is on inquiry notice. And to that point, Your Honor, there's a second storm warning that I'd like to highlight, because it shows not only that plaintiffs were on inquiry notice, but also that the claims on which they now rely were actually in the public sphere well before the two years ran. And this was in November 8th of 2011. Mr. Simons pled guilty to one count of delivering and disclosing a false return. But that was the personal return of David and Lynn Smith, right? Yes. That is correct. That plea agreement doesn't say anything about his work for the entity under review by the SEC, right? It talks about . . . I'm sorry, Your Honor. It doesn't say anything about McGinn-Smith, right? The plea agreement does. It refers to McGinn-Smith entities, specifically TDM Cable Funding, LLC. And there are two important factual admissions that were made in that, in the guilty plea. One is that Mr. Simons followed instructions from Mr. Smith to reclassify fees as loans, and that's located at page 1486 of the appendix. And the second factual admission is that as a result of following that instruction, the return failed to report $407,000 in fees to Mr. Smith. And the reason that those factual admissions are so important is because the plaintiffs rely on those factual admissions throughout their complaint. The guilty plea is referenced specifically at paragraphs 143 through 145 of the complaint, but there are at least seven implicit references to those factual allegations. And I'd like to highlight two of those to make this point. In paragraph 160 of the complaint, which is page 136, rather, of the appendix,  the plaintiffs allege defendants had actual knowledge of the fraud and participated in the fraud. For example, the defendants mischaracterized income payments to McGinn-Smith principals as loans, although they knew that the monies were reportable as income. And perhaps most importantly, at the motion to dismiss hearing below, plaintiffs' counsel was making the argument of the import of the guilty plea in terms of supporting their claim. And at page 186 of the appendix, plaintiffs' counsel stated that the guilty plea, quote, goes to actual knowledge of fraud. And additionally, in 2012, January 26 of 2012, Mr. McGinn and Mr. Smith were indicted on criminal charges relating to the Ponzi scheme. And the indictment specifically referred to outside accountants and alleged that Mr. Smith had directed accountants at the broker-dealer and an outside accounting firm to reclassify transactions. So again, it's notice of this reclassification of transactions, which is found throughout plaintiff's complaint and on which they rely. And so the point being, Your Honors, is that not only were plaintiffs on inquiry notice, but the actual facts on which they rely were in the public sphere. And I should mention that the guilty plea that we talked about a few moments ago, there was a press release issued the same day by the U.S. Attorney's Office. So even if they were not monitoring the docket in the Northern District, as I would submit they had an obligation to do in light of all the circumstances, certainly if they had kept an eye on the U.S. Attorney's Office website. And if Your Honors have no further questions, we would rest on our papers. Thank you very much. Thank you. Mr. Kang, you have two minutes. The allegations relating to Mr. Simmons back in 2011, I believe the defendants are overemphasizing what happened, as the Court pointed out, that it related to Mr. Simmons mischaracterizing an income of $407,000 as a loan on Mr. Smith, David Smith's personal income. That's what happened at the time. I'd like to turn the Court's attention to the case that the Court addressed back in 2003, Levitt v. Bear Stearns case. In that case, the Court specifically noted, again, about the difficulty of addressing any notice of inquiry as to the secondary actor compared to the primary actor. In that case, Bear Stearns was the clearing bank who participated in the fraud perpetrated by Foster Sterling. Unlike the case that we have, in that case, everyone knew about the participation by Bear Stearns. Their identity was known. Everybody knew what they did. Even still, this Court said, in reversing district court's opinion, that it dismissed the case based on such a limitation argument, said, the question comes down to what information did the plaintiffs have at the time? What information did they have that would trigger an inquiry notice? Which takes us to the case that the Court of Appeals ruled back in 1895, in Higgins v. Krauss case, which still remains good law, which language is still cited by various different courts. In that case, the New York Court of Appeals, it talks about the concept of duty to inquire. It says, if the duty to inquire arises, then if the plaintiff does not inquire, then the knowledge is imputed. But it asks a very important question. But why should a duty to inquire even arise? There has to be a reason. Just because something goes wrong, just because your investment fails, does not mean that you have a duty to inquire. Here we know there was a fraud, or at least a reasonable investor would have very good reason to think there was a fraud, because the SEC charged the operators of the Ponzi scheme with fraud. So there's no question that a duty to inquire arises. And now the question is, is there authority under state law for the proposition that when you are on notice that you've been defrauded and you do nothing to try to figure out who is responsible for that fraud, that nevertheless you need to be specifically on separate notice as to each defendant that you may choose ultimately to sue? And, Your Honor, that's exactly what happened in Levitt v. Bear Stearns case. A couple of years before the plaintiffs brought their claims against Bear Stearns, SEC brought an action, enforcement actions, against the primary actor, which was Foster Sterling. And a few years later, that's when the plaintiffs brought their action against the secondary actor, which is Bear Stearns. And that was applying the New York State statute of limitations. Yes, Your Honor. And then this court said, despite SEC's bringing an action two years before, plaintiffs still did not have a reason to trigger this inquiry notice. And this, going back to the Higgins v. Krause case, what the court of appeals held was you need to have a suspicion that not only the fraud has been identified, but you need to have the defendant, right defendant, just because something goes wrong and you file lawsuits, the court called that the rash doctrine, which the court called it unnatural. And that's what we have in this case. Thank you very much, Mr. Kang. We'll take the matter under advisement.